STATE of Wisconsin, Plaintiff-Respondent,

v.

Robert J. PALLONE, Defendant-Appellant-Petitioner.

Supreme Court

*No. 98–0896–CR. Oral argument April 7, 2000.——Decided June 30, 2000.*

2000 WI 77

(Also reported in 613 N.W.2d 568.)

For the defendant-appellant-petitioner there were briefs by *Steven J. Watson* and *Steven J. Watson Law Office*, Elkhorn, and oral argument by *Steven J. Watson*.

For the plaintiff-respondent the cause was argued by *Jennifer E. Nashold*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

¶ 1. DAVID T. PROSSER, J. Robert J. Pallone (Pallone) seeks review of a published decision of the court of appeals, *State v. Pallone*, 228 Wis. 2d 272, 596 N.W.2d 882 (Ct. App. 1999). The court of appeals affirmed the decision of the Circuit Court for Walworth County, Robert J. Kennedy, Judge, denying Pallone's motion to suppress evidence obtained when police arrested the driver of the vehicle in which Pallone was a passenger and searched a duffel bag belonging to Pallone. The circuit court concluded that the search was proper because it was conducted incident to an arrest.

¶ 2. The court of appeals affirmed, holding that the search of the duffel bag was valid pursuant to the decision of the United States Supreme Court in *Wyoming v. Houghton*, 526 U.S. 295 (1999). Under *Houghton*, officers with probable cause to search a motor vehicle also can inspect passenger belongings that are capable of containing the object of the search. The court of appeals distinguished a case upon which Pallone relied, *Knowles v. Iowa*, 525 U.S. 113 (1998). In *Knowles*, the Supreme Court held that police may not search a vehicle during a traffic stop when the driver receives a citation but is not arrested. The court of appeals underscored that in this case, the search was incident to an arrest, and therefore the *Knowles* prohibition did not apply to Pallone.

¶ 3. The issue before the court is whether police may conduct a warrantless search of the belongings in a motor vehicle when the driver of this vehicle is under arrest but police do not have probable cause to arrest or detain the passenger. We hold that the search of Pallone's duffel bag was constitutionally sound, on the facts presented, for two reasons. First, the search was valid under the "search incident to arrest" exception to

the warrant requirements set forth in Fourth Amendment to the United States Constitution and art. I, § 11 of the Wisconsin Constitution. Second, the search was proper because police had probable cause to search the passenger compartment of Riff's truck and any containers capable of concealing the object of the search. We therefore conclude the search of the duffel bag was valid, and the evidence obtained from the search was admissible at trial. Accordingly, we affirm the decision of the court of appeals.

## FACTS

¶ 4. Some of the facts in this case are in dispute. On June 27, 1997, James P. Riff (Riff) and his schoolmate, Pallone, embarked on a Friday-night drive from Illinois to Wisconsin in Riff's black Ford pickup truck. They were planning to meet a friend at a local roadhouse. Riff had consumed one alcoholic drink at his Barrington home before he and Pallone set off on the trip. At approximately 11:20 p.m., Riff and Pallone pulled into Municipal Parking Lot #1 in the Village of Fontana in Walworth County. They had with them a 12 pack of beer, which had been ripped open and contained both empty and full bottles. There is a dispute whether the 12 pack lay on the bench seat inside the pickup cab next to the driver, Riff, or whether it lay in the bed of the truck near the cab.[1] What is undisputed is that Riff grabbed a 12-ounce, short-neck bottle of Budweiser out of the pack as he was pulling into the lot, opened it, drank half of it, and stepped out of the truck with the bottle in his hand.

---

[1] Riff testified that the 12 pack was in the cab, on the bench seat, of the truck. Officer Recknagel stated that he found the beer at the front of the truck bed and explained that he did not find any beer inside the cab.

168

¶ 5. Village of Fontana Police Officer Jeff Recknagel was on duty that summer night and had parked his marked squad car in the same parking lot. Recknagel was standing at the north end of the lot with a fellow officer when he saw Riff pull in and park in a stall about 20 feet from the two uniformed officers. Riff exited the pickup holding the Budweiser, and he took two drinks as Recknagel approached the truck and pointed his flashlight on Riff. In Fontana, separate village ordinances prohibit open intoxicants in public and in motor vehicles. Seeing Riff exit the truck, Recknagel was concerned that Riff possessed open intoxicants in the truck.

¶ 6. Recknagel directed Riff to hand over the bottle. Riff complied, and Recknagel noticed that the bottle still contained about one inch of liquid. Officer Recknagel remarked, "I got you," or words to that effect, and the two men walked to the back of the pickup, where Recknagel asked Riff for identification. While standing at the rear of the truck, Recknagel inquired whether there were any open beer bottles in the truck, and Riff replied in the affirmative. Officer Recknagel asked if he "could go and get it," or "take a look," and Riff answered, "Go right ahead."[2] The exchange between Riff and Recknagel was comfortable, polite, even relaxed.

¶ 7. Officer Recknagel explained that he then told Riff that he was under arrest. Recknagel believed Riff had violated the ordinance prohibiting open intoxicants in a motor vehicle. Riff, on the other hand,

---

[2] The State does not contend that Riff's statement, "Go right ahead" constituted a consent under the "consent to search" exception to the Fourth Amendment. Consent is one of the established exceptions to the warrant requirement. *See State v. Douglas*, 123 Wis. 2d 13, 18, 365 N.W.2d 580 (1985).

testified at the suppression hearing that Officer Recknagel did not state he was under arrest, did not handcuff him, and did not read Riff his *Miranda* rights.[3] Rather, Riff presumed he only would be getting a "ticket" or citation for public consumption, not a "ticket" for possession of open alcohol in a vehicle. As a result, Riff thought he would only pay a fine and not be taken to the police station.

¶ 8. Passenger Pallone had stepped out of the pickup at the same time as Riff. While Recknagel and the other officer seated Riff in the squad car, Pallone stood unguarded between the squad car and the truck. Recknagel testified that at this point, no specific facts led him to believe that either Riff or Pallone posed a danger. Indeed, nothing about the situation made Recknagel believe that a pat-down search of either man was necessary.

¶ 9. As Recknagel reapproached Riff's pickup on the driver's side to conduct a search, he noticed that Pallone followed him by walking parallel to Recknagel along the opposite side of the vehicle. Pallone then stood by the passenger door.

¶ 10. Pallone put his hands on a zippered, blue-green duffel bag that rested on the middle of the truck cab's front bench seat. To Officer Recknagel, Pallone appeared nervous: He spoke in short sentences and kept looking up and down at the officer and the duffel bag. Pallone commented that he wished to remove the duffel bag. Recknagel directed him to leave the bag

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966). Based on Officer Recknagel's testimony, the court made a finding of fact that at this point, Recknagel did tell Riff that he was under arrest. The circuit court found Officer Recknagel reliable, observing that he "didn't make his case look stronger, but he testified very frankly."

alone, adding that he planned to search the duffel bag because it was situated inside the vehicle. Recknagel later testified that Pallone's behavior, which suggested to the officer that the duffel bag contained something he "wasn't supposed to know about [ ] or see," caused concern for his own safety: "I didn't know what was inside of that bag, if there was a weapon possibly inside the bag, or maybe there could have been more open containers of alcohol inside the bag." Recknagel indicated that police are trained to assume that there is a potential for harm in similar encounters. When he saw Pallone reach for the duffel bag, Recknagel suspected Pallone might be reaching for a weapon.

¶ 11. Recknagel instructed Pallone to walk back to the rear of the truck, where the other officer kept an eye on Pallone while Recknagel searched the vehicle. Recknagel looked through the cab, in the glove compartment, and under the seats. During the course of the search, he found the ripped open, 12 pack of beer, with two or three bottles missing from it. Riff testified that Recknagel found the 12 pack of beer with open and full bottles at this point and placed it in the back of the pickup truck. Recknagel's testimony does not clarify what he did with the beer.

¶ 12. Officer Recknagel saw two airline luggage tags that identified Pallone as the duffel bag's owner. Recknagel then searched the duffel bag. He testified that he was looking for weapons and evidence relating to the open intoxicants charge. Upon opening the duffel bag, Officer Recknagel saw a number of personal items, including clothing, shoes, and hair care products. When he lifted up the clothing, Recknagel noticed that enough room remained in the two-and-one-half foot long duffel bag to conceal an open container of beer or,

he reasoned, "[a]ny type of a knife, a handgun, any type of a weapon that could be used to hurt us."

¶ 13. Underneath the clothing, Recknagel also found an open, 150-count, box of clear sandwich bags. Although Recknagel testified that, based on his training and experience, plastic baggies usually are associated with narcotics or controlled substances, he also explained that the box, approximately eight to 10 inches long, potentially could contain a weapon.

¶ 14. In the open baggie box, a four-ounce, white plastic bottle labeled "Inositol Powder" caught Recknagel's eye.[4] Officer Recknagel opened the bottle and saw that it was full, containing a large amount of white powder. Thinking the powder might be cocaine, Recknagel examined the inside of the baggie box. He testified that at this stage, he knew the baggie box did not contain a beer bottle and he was not looking inside the box for a weapon.

¶ 15. Recknagel noticed a plastic baggie tied into a knot next to the "Inositol Powder" bottle. The baggie contained a hard white ball, about one inch in diameter, comprised of a white powder. Assuming the ball to be cocaine, Recknagel seized the baggie, the bottle, and the duffel bag. Recknagel placed Pallone under arrest and transported him and Riff to the Fontana Police Department.

¶ 16. At the station, Pallone read the *Miranda* warnings from a police department form. Nonetheless, Pallone agreed to answer some questions, and he spoke

---

[4] According to the criminal complaint, inositol is a common cutting agent for cocaine. Although Officer Recknagel testified that he read the word "inositol" on the bottle label, the circuit court found that Recknagel never stated that it was a cutting agent for cocaine or that he knew the presence of inositol might implicate drug activity.

with Officer Recknagel for 15 to 20 minutes. Pallone stated that the duffel bag belonged to him, adding that he used inositol as a laxative. Although he would not address the precise nature of the white ball, Pallone told Recknagel he had purchased the substance from a middleman in Chicago and conceded that it was wrong to possess it. According to Officer Recknagel, at that point Pallone said that he did not want more trouble by making incriminating statements.

¶ 17. After a laboratory analysis revealed that the white ball consisted of 5.85 grams of cocaine,[5] the Walworth County Assistant District Attorney filed a Criminal Complaint on September 15, 1997. The complaint charged Pallone with possession of more than five grams but not more than 15 grams of cocaine or cocaine base with intent to deliver, contrary to Wis. Stat. § 961.41(1m)(cm)2 (1995–96).[6]

## PROCEDURAL HISTORY

¶ 18. On December 2, 1997, Pallone submitted a motion to suppress, arguing that police obtained the cocaine evidence during an unlawful search and seizure of his duffel bag.[7] Officer Recknagel and Riff

---

[5] Laboratory analysis also indicated that the white powder in the plastic bottle labeled "Inositol Powder" was, in fact, inositol.

[6] All references to the Wisconsin Statutes are to the 1995–96 volumes unless indicated otherwise.

[7] Pallone initially also challenged admission of the statements he made to Officer Recknagel at the Village of Fontana Department. He did not challenge the admissibility of that evidence in his appeal either to the court of appeals or to this court. *State v. Pallone*, 228 Wis. 2d 272, 275 n.1, 596 N.W.2d 882 (Ct. App. 1999).

testified at a suppression hearing on February 26, 1998.

¶ 19. The circuit court denied Pallone's motion to suppress on March 13, 1998, concluding that the search was valid as incident to Riff's arrest. After highlighting the exceptionally candid manner in which Officer Recknagel testified, the circuit court made a finding of fact that Recknagel told Riff he was "under arrest" before the search of the vehicle occurred. Once Riff was under arrest, police were entitled to continue searching for more beer. The court agreed that beer normally does not constitute contraband but nonetheless concluded that presence of beer in a vehicle can be evidence of an offense, even if only an offense contrary to an ordinance.

¶ 20. Although the circuit court expressed discomfort with the notion that the belongings of a presumably innocent passenger can be searched incident to the driver's arrest, the court explained that case law expressly authorizes such searches. Officer Recknagel, the court observed, was justifiably concerned that Pallone might grab a weapon from the duffel bag.[8] The search of the duffel bag for weapons

---

[8] Judge Kennedy remarked:

My conclusion from the facts seemed to be that, [ ] before the man reached for the bag, [Officer Recknagel] had no intention to search it—I'm not even sure he had an intention to search the car—but that when [Pallone] reached for and tried to take that bag out, the instincts of the officer took over with, [whoa], he's trying to hide something. I'm interested. What is he trying to hide? I want to know what it is.

. . .

And I realize the defendant in this case tried to remove his duffel bag. Certainly indicated he was going to. But I think the officer was perfectly justified at that particular point when saying, "No, stop." Why? Because of the danger of weapons. Admittedly, he wasn't too

led Recknagel to see the "Inositol Powder" bottle and the plastic baggie laying next to it. Once the officer saw those items, the court reasoned, he was entitled to extend the search in its "logical direction" because there was probable cause to believe that the bottle and baggie contained controlled substances.

¶ 21. After the circuit court denied Pallone's motion to suppress, the district attorney amended the information to allege that Pallone possessed five grams or less of cocaine or cocaine base with intent to deliver in violation of Wis. Stat. § 961.41(1m)(cm)1. On March 26, 1998, Pallone pled guilty to this reduced charge pursuant to a plea agreement. The circuit court withheld Pallone's sentence and placed him on probation for three years with conditions, including a four-month period of incarceration in the county jail. Pallone then appealed the denial of his suppression motion. *Pallone*, 228 Wis. 2d at 273.

¶ 22. The court of appeals affirmed. *Pallone*, 228 Wis. 2d at 273. The court harmonized *Knowles*, 525 U.S. 113, and *Houghton*, 526 U.S. 295, two decisions issued by the United States Supreme Court after the circuit court made its ruling in the motion to suppress. *Pallone*, 228 Wis. 2d at 276–79.

¶ 23. The court of appeals distinguished this case from *Knowles*, 525 U.S. 113, a case in which the Supreme Court held that a warrantless search incident to the issuance of a traffic citation violated the Fourth

---

afraid; but it was a matter—an item of concern of [mind]. And besides that, objectively, he better be concerned. If he wasn't really very concerned, he should have been at that point when someone all of a sudden wants to reach in and grab this bag and pull it out. As an officer who wants to protect himself, you better be concerned. So I think he had every right also in that case to search [the duffel bag] for weapons for his protection even though he wasn't particularly concerned about it.

Amendment. The issuance of a citation without an arrest does not give rise to authority to search under an exception to the constitutional warrant requirement because a routine traffic stop poses fewer threats to officer safety and does not compromise the discovery and preservation of evidence. *Pallone*, 228 Wis. 2d at 276–77 (citing *Knowles*, 525 U.S. at 116–17). By contrast, the search of the duffel bag was incident to a valid arrest that "triggered the heightened concern for the safety of the officer." *Id.* at 278.

¶ 24. Finding that the *Knowles* decision did not apply to the search of Pallone's duffel bag, the court of appeals instead relied on *Houghton*, in which the Supreme Court determined that the search of a pocketbook belonging to an automobile passenger was proper because police had probable cause to search the vehicle for evidence. 526 U.S. at 302, 307. The Court turned to its earlier decision in *United States v. Ross*, 456 U.S. 798 (1982), in which it had held that if probable cause justifies a search, police may inspect every part of the vehicle passenger compartment and its contents capable of concealing the object of the search. *Pallone*, 228 Wis. 2d at 279 (citing *Houghton*, 526 U.S. at 301). In *Houghton*, the Court applied the *Ross* rule to passenger belongings, concluding that the validity of a search does not hinge on whether the owner of the property is suspected of a crime, but rather whether there is reasonable cause to believe that the area to be searched will yield the object of the search. *Id.* (citing *Houghton*, 526 U.S. at 302).

¶ 25. The court of appeals emphasized that the *Houghton* rule requires only probable cause to search, not probable cause to arrest. *Id.* at 280. The court determined that the search of the duffel bag was proper because Officer Recknagel had probable cause to arrest

176

Riff and therefore to search the truck and its contents for evidence relating to the arrest. *Id.* at 280–81. The court concluded that once Recknagel found the "Inositol Powder" and the baggie box, he could not be expected to overlook the incriminating evidence simply because it was not the same item, beer, for which he initially had searched. *Id.* at 281.

## STANDARD OF REVIEW

■

¶ 26. The issue in this case is whether the search of Pallone's duffel bag was proper under the search and seizure provisions of both the United States and Wisconsin Constitutions. The application of constitutional principles to a set of evidentiary or historical facts poses a question of constitutional fact. *State v. Martwick*, 2000 WI 5, ¶ 17, 231 Wis. 2d 801, 604 N.W.2d 552.

■

¶ 27. This court engages in a two-step inquiry when it analyzes issues of constitutional fact. *Id.* at ¶ 16. First, in reviewing a motion to suppress, this court applies a deferential standard to the circuit court's findings of evidentiary, historical facts. *Id.* at ¶ 18. We thus affirm the circuit court's findings of fact, and inferences drawn from those facts, unless they are clearly erroneous. *Id.*; *State v. Harris*, 206 Wis. 2d 243, 249–50, 557 N.W.2d 245 (1996). Second, we review the circuit court's application of constitutional principles to the evidentiary facts. *Martwick*, 2000 WI 5, ¶ 17. This second step presents a question of law that we review independently. *Id.* at ¶ 18; *State v. Richardson*, 156 Wis. 2d 128, 137–38, 456 N.W.2d 830 (1990).

## ANALYSIS

¶ 28. The Fourth Amendment to the United States Constitution[9] and art. I, § 11 of the Wisconsin Constitution[10] both protect citizens from unreasonable searches and seizures. This court historically follows the interpretations of the United States Supreme Court when it construes the search and seizure provisions of both constitutions. *State v. Secrist*, 224 Wis. 2d 201, 208–09, 589 N.W.2d 387 (1999). By interpreting these provisions in a manner that is consistent with the precedent established by the Supreme Court, we ensure consistency in the application of constitutional principles. *State v. Fry*, 131 Wis. 2d 153, 173–74, 388 N.W.2d 565 (1986).

¶ 29. A warrantless search is per se unreasonable unless one of the "few specifically established and well-delineated exceptions" justifies the search. *State v. Phillips*, 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998) (citing *Coolidge v. New Hampshire*, 403 U.S.

---

[9] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[10] Article I, § 11 of the Wisconsin Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

443, 454–55 (1971)); *Katz v. United States*, 389 U.S. 347, 357 (1967). The State bears the burden of proving that a warrantless search falls under one of the established exceptions. *See Katz*, 389 U.S. at 357.

██

¶ 30. The law now recognizes multiple exceptions to the general proscription against warrantless searches. *State v. Milashoski*, 159 Wis. 2d 99, 111–12, 464 N.W.2d 21 (Ct. App. 1990), *aff'd*, 163 Wis. 2d 72, 471 N.W.2d 42 (1991) (listing 10 exceptions and controlling authority for each); *see also Ross*, 456 U.S. at 806–09. One of these exceptions allows warrantless searches if the search is conducted "incident to a lawful arrest." Wis. Stat. § 968.11;[11] *Abel v. United States*, 362 U.S. 217 (1960); *Fry*, 131 Wis. 2d 153. A second allows law enforcement officers to search a motor vehicle without a warrant if the officers have probable cause to believe that the vehicle contains the object of the search. *Ross*, 456 U.S. at 806–08. Both exceptions derive from distinct precedential strains and reflect unique rationales and requirements. We therefore discuss each in turn.

---

[11] Wisconsin Stat. § 968.11 provides:

**Scope of search incident to lawful arrest.** When a lawful arrest is made, a law enforcement officer may reasonably search the person arrested and an area within such person's immediate presence for the purpose of:

(1) Protecting the officer from attack;

(2) Preventing the person from escaping;

(3) Discovering and seizing the fruits of the crime; or

(4) Discovering and seizing any instruments, articles or things which may have been used in the commission of, or which may constitute evidence of, the offense.

## 1. Search Incident to Arrest

¶ 31. We first consider whether Officer Recknagel's search of the duffel bag was permissible under the "search incident to arrest" exception to the warrant requirements. The search incident to arrest exception permits the warrantless search of the passenger compartment of a vehicle and any containers situated in that compartment if the search is incident to a lawful arrest. *New York v. Belton*, 453 U.S. 454, 460 (1981).

¶ 32. For the search incident to arrest exception to apply, there must be an arrest. *Knowles*, 525 U.S. at 117–18. The requirement of an arrest is a "bright line rule." *Id.* at 118 (quoting *United States v. Robinson*, 414 U.S. 218 (1973)). Because the "fact of the lawful arrest" establishes the authority to search, *Robinson*, 414 U.S. at 235, this exception does not require a showing that the police officer had probable cause to believe that a vehicle contains contraband. *See generally id.* at 234–35. The fact that there is an arrest gives rise to two heightened concerns that justify a warrantless search: (1) the need to ensure officer safety, and (2) the need to discover and preserve evidence. *Knowles*, 525 U.S. at 116–18.

¶ 33. Under Wis. Stat. § 968.11 and the decision of the United States Supreme Court in *Chimel v. California*, 395 U.S. 752 (1969), the search incident to arrest exception allows police officers to search those areas of a vehicle within the "immediate control" of the person under arrest. *Fry*, 131 Wis. 2d at 165. This exception to the warrant requirement acknowledges that in arrest situations, it is reasonable for the officer to search the area into which "an arrestee might reach in order to grab a weapon or evidentiary items."

*Chimel*, 395 U.S. at 763; *see also Fry*, 131 Wis. 2d at 164. *Chimel* recognized that warrantless searches may be necessary to guarantee officer safety and to discover evidence. *See Fry*, 131 Wis. 2d at 165.

¶ 34.　The Supreme Court refined the meaning of which areas of a vehicle are within an arrestee's "immediate control" in *Belton*, 453 U.S. 454. The Court recognized that the "immediate control" terminology adopted in *Chimel* did not provide a workable standard for calibrating the scope of a valid search. *Id.* at 460. The Court therefore extended the rule of *Chimel* to include the passenger compartment. *Id. Belton* permits the search of a passenger compartment when an occupant of the vehicle is under arrest. *Id.*

¶ 35.　The *Belton* Court also expressly permitted the inspection of any containers found within the passenger compartment, whether open or closed. *Id.* at 460–61. The Court determined that a lawful custodial arrest justifies the infringement of privacy interests. *Id.* at 461. Based on the *Belton* holding, this court held that a search incident to arrest extends to the glove compartment of a vehicle. *Fry*, 131 Wis. 2d 153, 180. The search was lawful even though both defendants in *Fry* were handcuffed, confined in separate squad cars, and guarded by officers at the time of the search. *Id.* at 186 n.1 (Bablitch, J., dissenting). The *Fry* decision thus did not gauge whether the defendant actually had access to the interior of the vehicle. *See State v. Murdock*, 155 Wis. 2d 217, 233, 455 N.W.2d 618 (1990).

¶ 36.　In the years since *Belton*, the United States Supreme Court revisited the "bright-line rule" underpinning the search incident to arrest exception: A warrantless search under the exception requires an actual arrest. *Knowles*, 525 U.S. 118. Warrantless

181

searches are not permitted under this exception when a driver receives a traffic citation but is not placed under arrest. *Id.*

¶ 37. In *Knowles*, an Iowa police officer pulled over a vehicle during a routine traffic stop because the driver, Knowles, was traveling 43 miles per hour in a 25 mile per hour zone. *Id.* at 114. Although Iowa law gave officers the discretion to arrest drivers for traffic violations, the police officer in *Knowles* only issued a traffic citation. *Id.* at 114–15. After its issuance, the officer engaged in a full search of the car and found a marijuana bag and a "pot pipe." *Id.* at 114. The officer arrested Knowles, who later was charged with a violation of Iowa's controlled substance laws. *Id.*

¶ 38. Knowles sought to suppress the evidence, arguing that the search incident to arrest exception did not apply because he was not under arrest. *Id.* at 114–15. The trial court denied his suppression motion. *Id.* The Iowa Supreme Court affirmed the trial court, reasoning that a "search incident to citation" exception can be applied to the Fourth Amendment when the arresting officer has probable cause to arrest the driver. *Id.* at 115–16 (citing *State v. Knowles*, 569 N.W.2d 601, 620 (Iowa 1997), *rev'd*, 525 U.S. 113 (1998)).

¶ 39. In a unanimous decision written by Chief Justice Rehnquist, the Supreme Court reversed, holding that the search violated the Fourth Amendment. The Court's holding underscored the two historical rationales that justify the search incident to arrest exception: (1) the heightened threat to officer safety implicit in an arrest, and (2) the need to discover and preserve evidence that later can be used at trial. *See id.* at 116–17.

¶ 40. The *Knowles* Court explained that these two rationales for the exception are not implicated during the issuance of a speeding citation. First, danger to an officer "flows from the fact of the arrest, and its attendant proximity, stress, and uncertainty." *Id.* at 117. The issuance of a citation for a minor traffic violation, by contrast, does not place the officer in any extended exposure with the driver. *Id.* Rather, a citation usually is the product of a brief encounter, during which it is less likely that a person will be hostile. *Id.* Second, the need to preserve evidence for later use at trial does not arise when the driver receives a speeding citation. In most instances, once police issue a citation, "all the evidence necessary to prosecute that offense had been obtained." *Id.* at 118. For instance, under the facts of *Knowles*, "[n]o further evidence of excessive speed was going to be found either on the person. . .or in the passenger compartment." *Id.*

¶ 41. Commentators agree that in *Knowles*, the Supreme Court clarified that "a search incident to arrest really means what it says—if something other than an arrest occurs, one should look beyond this justification to justify the search."[12] Thus, even if the exception might not apply to the issuance of a traffic citation, "officers have other, independent bases to search for weapons and protect themselves from danger." *Id.* at 117. Those bases may include the other recognized exceptions to the Fourth Amendment, including the probable cause to search exception that we examine below. *See id.*

---

[12] Honorable Daniel T. Gillespie, *Bright-Line Rules: Development of the Law of Search and Seizure During Traffic Stops*, 31 Loy. U. Chi. L.J. 1, 26 (1999) (quoting Major Walter M. Hudson, *A Few New Developments in the Fourth Amendment*, 1999-APR Army Law. 25, 35).

¶ 42. Having explored the scope and rationale underlying the search incident to arrest exception, we next explain how it applies to Pallone. Under this exception, we consider: (1) whether there was an arrest as the bright-line rule of *Knowles* requires, and (2) whether a heightened threat to officer safety or a need to discover or preserve evidence justified the warrantless search. If these requirements are met, then *Belton* and *Fry* authorize a warrantless search of the passenger compartment and any containers, open or closed, located in that compartment.

██

¶ 43. In this case, the search incident to arrest exception applies because Riff was under arrest. Wisconsin Stat. § 800.02(6) provides that, "A person may be arrested without a warrant for the violation of a municipal ordinance." Moreover, arrests for civil forfeitures are not per se unconstitutional. *Fry*, 131 Wis. 2d at 158–66. Consequently, the Fourth Amendment does not preclude searches incident to arrests for noncriminal violations. *State v. King*, 142 Wis. 2d 207, 210–11, 418 N.W.2d 11 (Ct. App. 1987) (citing *Gustafson v. Florida*, 414 U.S. 260, 265 (1973); *Fry*, 131 Wis. 2d 153; *State v. Mabra*, 61 Wis. 2d 613, 623–24, 213 N.W.2d 545 (1974)). For a search incident to arrest to be valid, there must be an actual arrest, not just a reasonable likelihood that a suspect will be arrested.

██

¶ 44. At oral argument, Pallone proposed that whether someone is under arrest presents a question of law, and he therefore asks this court to make its own independent finding that Riff was not under arrest. Pallone's understanding of the standard for reviewing an arrest is only partially correct. Whether someone is "under arrest" or in "custody" is a question of law in

those cases in which the facts are *undisputed. State v. Swanson,* 164 Wis. 2d 437, 445, 475 N.W.2d 148 (1991). To the extent that facts are *disputed* in a suppression matter, however, this court deferentially accepts the factual findings of the circuit court unless they are clearly erroneous. *See State v. Guzy,* 139 Wis. 2d 663, 671, 407 N.W.2d 548 (1987).[13]

¶ 45. The question of Riff's arrest was in dispute at the suppression hearing and is in dispute in this appeal. The circuit court made an express finding of fact. Based upon Officer Recknagel's testimony, the circuit court found that Riff was under arrest. The court praised the particularly frank qualities of the testimony, noting with gratification that Recknagel did not exaggerate or otherwise color his rendition of the events. We accept these findings because it is the role of the fact finder listening to live testimony, not an appellate court relying on a written transcript, to gauge the credibility of witnesses. *State v. Hughes,* 2000 WI 24, ¶ 2 n.1, 233 Wis. 2d 280, 670 N.W.2d 621.

¶ 46. Because this was a search incident to an arrest, not a search incident to the issuance of a traffic citation with no arrest, the *Knowles* rule does not apply to this case.

¶ 47. We next explore whether the particular circumstances of this case gave rise to either of the two historical justifications for the search incident to arrest exception. We first consider whether this situation posed a heightened threat to officer safety. The facts of this case are more compelling than those analyzed in

---

[13] Even if the circuit court does not make an explicit factual finding, we assume that the court made the finding in a manner that supports its final decision. *Sohns v. Jensen,* 11 Wis. 2d 449, 453, 105 N.W.2d 818, 820 (1960).

*Fry*. This was not a scenario in which both occupants of a vehicle were guarded by the police, handcuffed, and confined to a squad car. Here, it was conceivable that Pallone, who stood unguarded, could have seized a weapon from the duffel bag when he followed Officer Recknagel back to the truck cab. An occupant, no less than an arrestee, can pose a danger to officer safety, *see Robinson*, 414 U.S. at 228, and a passenger, no less than an arrestee, can seize weapons or objects to assault an officer or effect an escape.

¶ 48. The threat to officer safety during an arrest "flows from the fact of the arrest, and its attendant proximity, stress, and uncertainty, and not from the grounds for arrest." *Knowles*, 525 U.S. at 117. In this case, the danger to Officer Recknagel flowed from the proximity and uncertainty Pallone posed once Riff was under arrest.

¶ 49. At first, the exchange between Recknagel and Riff was not hostile but rather polite and relaxed. Pallone posed no apparent threat; in fact, he stood unguarded between the squad car and the truck. "Police safety is of paramount importance in fourth amendment jurisprudence." *State v. Murdock*, 155 Wis. 2d 217, 237, 455 N.W.2d 618 (1990) (Abrahamson, J., dissenting). Here, the atmosphere altered once Riff sat in the squad car and Officer Recknagel reapproached the truck. Pallone paralleled the officer's steps along the passenger side, and he appeared nervous as he reached for the duffel bag. Officer Recknagel suspected Pallone might be reaching for a weapon, and he testified that his training and instinct punctuated his concern. The duffel bag had sufficient room to conceal a weapon, and the baggie box was large enough to contain a weapon. As the circuit court aptly stated, if

Recknagel "wasn't really very concerned, he should have been at that point" and had reason to search for weapons. We agree with the circuit court that the totality of the circumstances presented a potential for harm to the officers.

¶ 50. We now turn to the second historical justification for the search incident to arrest exception, the discovery and preservation of evidence. This was not a *Knowles* situation in which the issuance of a citation for speeding gave the officers all the evidence necessary to prosecute the offense. Here, further evidence, namely open bottles of beer, were likely to be found in the passenger compartment.

¶ 51. When Riff stepped out of the truck holding an open beer bottle, Officer Recknagel had reason to suspect that there were more open bottles of beer in the motor vehicle in violation of the Village of Fontana ordinance. More important, Riff told Recknagel that the truck contained open bottles, and he told Recknagel to "go right ahead" and look. In an arrest situation, we cannot expect an officer to stop looking for further evidence of the offense. Although Officer Recknagel confiscated the one open bottle Riff held, it was within the scope of his investigation to discover and preserve additional evidence of open beer bottles. Admittedly, it is unlikely that occupants of a truck would store spillable, open bottles of beer in a duffel bag while the vehicle is in motion. But it is conceivable that they might conceal the open bottles in a zippered duffel bag once they pull into a parking lot and step out.

¶ 52. Pallone asks this court to adopt the reasoning set forth by the Washington Supreme Court in *State v. Parker*, 987 P.2d 73 (Wash. 1999). In *Parker*, the court consolidated three cases in which police searched passenger belongings incident to the arrest of

the drivers. *Id.* at 76. We decline to apply the *Parker* holding because those cases are not, as Pallone contends, factually similar to this one. *Parker* did not implicate the two rationales that buttress the search incident to arrest exception. In *Parker*, police had no suspicion that the passengers were armed, dangerous, or had concealed evidence. *Id.* at 82. Moreover, the drivers in *Parker* were arrested for traffic violations, for which, much as in *Knowles*, there was no further tangible evidence to be lost. *Id.*

¶ 53. Although Pallone himself was not under arrest, the search incident to arrest exception applies in this case, unlike in *Parker* or *Knowles*, because the circumstances here gave rise to both of the two historical rationales at the heart of the exception, namely the safety of the arresting officer and the need to discover and preserve evidence.

¶ 54. The warrantless search of Pallone's duffel bag was a legal search incident to an arrest. Under *Belton* and *Fry*, Officer Recknagel was authorized to conduct a search of the passenger compartment of the truck and any containers situated in that compartment. That search, according to *Fry*, was appropriate even though Riff was sitting in the squad car. Its legitimacy was strengthened here because Pallone was standing at arm's length from the duffel bag. The authority to search incident to arrest is broad, *Robinson*, 414 U.S. at 232–33, and so it remains under the facts of this case.

¶ 55. We decline to exclude passenger property from the search incident to arrest exception under the facts of this case. Police may search the passenger compartment of a motor vehicle when an "occupant" is under arrest. *Belton*, 453 U.S. at 460. Together, *Belton*

and *Fry* allow the search of "any containers" situated in the compartment. *Id.*; *Fry*, 131 Wis. 2d at 176–77.

¶ 56. A contrary rule would overlook the reality that weapons and evidence can reside in passenger property just as easily as they can in arrestee belongings.[14] If this court were to adopt such a rule, we would provide vehicle occupants with the incentive to sabotage an otherwise legal search by concealing weapons or evidence in areas that remain within an occupant's easy reach. In this case, the danger to Recknagel was not diminished by the fact that Riff's arrest had been consummated and because the duffel bag was within Pallone's reach.

¶ 57. We therefore conclude that the warrantless search of the duffel bag was proper under the incident to arrest exception to the warrant requirements of to the Fourth Amendment and art. I, § 11 of the Wisconsin Constitution.

### 2. Probable Cause to Search a Motor Vehicle

¶ 58. We next consider whether Officer Recknagel's search was constitutional because there was probable cause. This exception permits the warrantless search of a vehicle or any containers within the passenger compartment if there is probable cause to believe that the vehicle or the containers hold the object of the search. *Ross*, 456 U.S. at 824. This rule extends to vehicles stopped in parking lots. *California v. Carney*, 471 U.S. 386, 392–93 (1985). The exception also applies to passenger belongings capable of con-

---

[14] This principle is of even greater consequence, as we outline below, under the exception that allows a warrantless search when police have probable cause to search a motor vehicle. *See Wyoming v. Houghton*, 526 U.S. 295, 303–06 (1999).

taining the object of the search. *Houghton,* 526 U.S. at 307. We again emphasize that the rationales and requirements for this exception differ from those that satisfy the search incident to arrest exception. One key distinction is that this exception requires an overriding standard of probable cause.

¶ 59.　Warrantless searches of homes are "presumptively unreasonable;" searches of vehicles are not. *See Welsh v. Wisconsin,* 466 U.S. 740, 749 (1984). During the course of the last 75 years, the Supreme Court has recognized that the unique nature of automobiles sets them apart from other areas protected from warrantless searches under the Fourth Amendment. *See Carroll v. United States,* 267 U.S. 132, 153 (1925).

¶ 60.　This probable cause exception for automobiles is built on two key factors that distinguish motor vehicles from other areas to be searched. First, the "ready mobility" of a vehicle makes it more likely that contraband or evidence of a crime will vanish during the period necessary to secure a valid warrant. *Houghton,* 526 U.S. at 304 (citing *Carney,* 471 U.S. at 390); *Carroll,* 267 U.S. at 153. Second, persons have reduced privacy expectations in motor vehicles, an expectation that "is significantly less than that relating to one's home or office." *Carney,* 471 U.S. at 391. For instance, people are accustomed to the "pervasive scheme of regulation" governing their automobiles. *Id.* at 392. Moreover, vehicles, unlike homes, are not devices for storing personal effects, and they move about the roadways with their occupants and contents in full view. *Cardwell v. Lewis,* 417 U.S. 583, 590 (1974). Even when a vehicle is not in motion, its ability to be readily mobile will justify a warrantless search, provided that the overriding standard of probable cause is met. *Carney,* 471 U.S. at 391–92; *Chambers v. Maroney,* 399

U.S. 42, 52 (1970). Thus, the exception can arise even if the vehicle is "found stationary in a place" like a parking lot. *Carney*, 471 U.S. at 388, 392 (probable cause to search a parked motor home).

¶ 61.　At first, the Supreme Court did not extend this exception to containers located within a vehicle. For instance, in *United States v. Chadwick*, 433 U.S. 1, 12 (1977), the Court reasoned that luggage implicates a higher expectation of privacy. *Chadwick* held that police violated the Fourth Amendment when they searched a footlocker, even though probable cause existed to believe that the footlocker, although not the vehicle itself, contained marijuana. *Id.* at 13–14. Similarly, in *Arkansas v. Sanders*, 442 U.S. 753, 763–64 (1979), the Court observed that the reduced privacy expectations upon which this exception is based do not extend to luggage, even if probable cause exists to believe a suitcase holds marijuana.

¶ 62.　Both the *Chadwick* and *Sanders* decisions prohibited the warrantless search of luggage, not other generic containers in vehicles, because luggage implicates enhanced privacy expectations. In *Sanders*, the Supreme Court implied that some containers, unlike luggage, may not trigger the same privacy protections, suggesting that the outward appearance of a container might determine whether the Fourth Amendment applies. *Id.* at 765 n.13. This observation foreshadowed the difficulty of predicting the degree to which the appearance of a container connotes privacy and which appearances invoke Fourth Amendment protections.

¶ 63.　The "outward appearance" standard proved unworkable, as the Court's plurality opinion in *Robbins v. California*, 453 U.S. 420 (1981), showed. In *Robbins*, the divided Court found that officers may not search containers based on outward appearance alone.

*Id.* at 425. Justice Stewart, writing for the plurality, rejected the notion that luggage is constitutionally distinguishable from "less worthy" containers. *Id. Robbins* thereby precluded the warrantless search of a plastic bag because some people, after all, use plastic bags as luggage. *Id.* at 426–27.

¶ 64. Against this background, the Court suggested that a test that "balanc[es] the multifarious circumstances presented by different cases" under the probable cause threshold offers little with which to guide police officers engaged in the "often competitive enterprise of ferreting out crime." *Dunaway v. New York*, 442 U.S. 200, 213–14 (1979). One standard was essential for measuring the reasonableness of probable cause to search, *id.*, and the Court eventually created one standard for containers situated in vehicles. In *Ross*, 456 U.S. at 800, the Supreme Court held that when law enforcement officers have probable cause to search a vehicle without a warrant, they also may conduct a warrantless search of all containers found inside the vehicle capable of containing the object of the search. *See also California v. Acevedo*, 500 U.S. 565, 576 (1991).

¶ 65. The *Ross* Court reached this conclusion for two reasons. First, the Court distinguished both *Chadwick* and *Sanders*, finding that those decisions explored situations in which police did not have probable cause to search the vehicle itself, only the luggage within it. *Ross*, 456 U.S. at 814. In *Ross*, by contrast, probable cause existed to believe that the automobile contained contraband. *Id.* at 820, 824. The Court stressed that the "object of the search," not the "nature of the containers," defines the parameters of a legal search. *Id.* at 824. Second, the Court recognized the practical benefits of a rule that extends the probable

standard to all containers. *Id.* at 820, 822. Noting that "[c]ontraband goods rarely are strewn across the trunk or floor of a car," the Court declined to burden law enforcement with a rule that would require officers to halt an otherwise permissible search if they encountered a container that required warrant. *Id.* at 820.

¶ 66. The *Ross* Court drew no distinction between containers in the possession of the driver and containers belonging to passengers. *See Houghton*, 526 U.S. at 301–02. In *Houghton*, a six-to-three decision authored by Justice Scalia, the Court reasoned that "if the rule of law that *Ross* announced were limited to contents belonging to the driver, or contents other than those belonging to passengers, one would have expected that substantial limitation to be expressed." *Id.* at 301. *Houghton* therefore applied the *Ross* rule to passenger belongings, holding that officers with probable cause to search a motor vehicle also may inspect those containers capable of concealing the object of the search. *Id.* at 307.

¶ 67. In *Houghton*, a Wyoming Highway Patrol officer pulled over an automobile for speeding and displaying a faulty break light during a routine traffic stop. *Houghton*, 526 U.S. at 297. The driver and two passengers occupied the vehicle. *Id.* at 297–98. As the officer questioned the driver, he noticed a hypodermic syringe in the driver's shirt pocket. The driver conceded "that he used it to take drugs." *Id.*

¶ 68. Following this admission, backup officers directed the two passengers out of the vehicle and searched the passenger compartment for contraband. Officers found a pocketbook belonging to one of the passengers, Houghton, on the backseat. Upon searching the pocketbook, officers discovered a pouch and wallet-like object containing a syringe, drug parapher-

nalia, and methamphetamine. *Id.* Houghton sought to suppress the evidence, the trial court denied the motion to suppress, and Houghton was convicted. *Id.* at 299.

¶ 69. The Wyoming Supreme Court reversed the conviction, holding that the search violated the constitution because the officer "knew or should have known that the purse did not belong to the driver." *Id.* (quoting *Houghton v. State,* 956 P.2d 363, 372 (Wyo. 1998), *rev'd,* 526 U.S. 295 (1999)). The court reasoned that passenger property exceeds the scope of a valid search "unless someone had the opportunity to conceal the contraband within the personal effect to avoid detection" and officers have probable cause to believe that contraband has been placed within the passenger property. *Id.*

¶ 70. The Supreme Court reversed, holding that "police officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search." *Id.* at 307. The Court determined that the inquiry turns not on whether "the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located" therein. *Id.* at 302.

¶ 71. Relying on *Ross,* 456 U.S. at 825, the *Houghton* Court reasoned that every container within a vehicle and its contents may contain contraband. *Houghton,* 526 U.S. at 301–02. The Court explicitly declined to create an exception for containers that are passenger property. *Id.* at 304. Excluding passenger property from the scope of a valid search would impair effective law enforcement because passengers "often [ ] engage[ ] in a common enterprise with the driver,"

sharing the same interest of concealing contraband.[15] *Id.* at 304. Moreover, a "passenger property exception" would preclude the discovery of contraband a driver might conceal in passenger belongings, even without the passenger's consent or knowledge. *Id.* at 305.

¶ 72. This court has recognized that passengers and drivers share expectations to privacy. *Harris*, 206 Wis. 2d at 255. These expectations, however, are not unlimited. Passengers, like drivers, have reduced expectations of privacy for items that they transport in motor vehicles.[16] *Houghton*, 526 U.S. at 303. In addition, a search of passenger property is less intrusive than the search of a passenger's person. Searches of property implicate fewer traumatic consequences and do not invoke the heightened protection inherent in searches of a person. *Id.* at 303; *id.* at 307–08 (Breyer,

---

[15] In making this observation, the Supreme Court distinguished the "common enterprise" often present between drivers and passengers from other situations in which complicity cannot be inferred as easily. *Houghton*, 526 U.S. at 304 (distinguishing passenger Houghton from "the unwitting tavern patron in" *Ybarra v. Illinois*, 444 U.S. 85 (1979)).

[16] Pallone directs our attention to a recent United States Supreme Court decision, *Bond v. United States*, — U.S. —, 120 S. Ct. 1462 (2000), which held that the search of a duffel bag belonging to a bus passenger violated the Fourth Amendment. The *Bond* case is distinguishable. The *Bond* Court analyzed the "plain view" or "public observation" exception under the Fourth Amendment. *Id.* at 1464. That exception implicates a different inquiry than the automobile exception, examining whether an individual had an actual expectation of privacy and whether that expectation is one that society is prepared to recognize as reasonable. By contrast, the automobile exception historically has recognized the reduced expectations of privacy inherent in automobile travel.

J., concurring) (citing *United States v. Di Re*, 332 U.S. 581 (1948)).[17] Police examination of belongings does not deprive an individual of the freedom of movement. *See Harris*, 206 Wis. 2d at 256–57 (citing *Guzy*, 139 Wis. 2d at 674–75) (same standard of seizure of person applies to drivers and passengers).

¶ 73. Although the *Houghton* Court, not unlike the *Knowles* Court before it, appeared to draw another "bright line" in the sand of Fourth Amendment analysis, *Houghton*, like other cases under this exception, still requires a threshold showing of the overriding standard of probable cause. *See Carney*, 471 U.S. at 392. Before police can conduct a warrantless search, they must have probable cause to believe that a passenger compartment holds the particular object of the search. This requirement distinguishes this exception from the search incident to an arrest exception.

¶ 74. To complete our examination of this exception, we therefore briefly turn to the standards that measure probable cause. Probable cause does not require a uniform degree of proof. *County of Jefferson v. Renz*, 231 Wis. 2d 293, 304, 603 N.W.2d 541 (1999). Depending upon the type of proceeding—whether an investigative stop, the issuance of a search warrant, the issuance of an arrest warrant, or the filing of a

---

[17] In his concurrence, Justice Breyer suggested that pocketbooks usually contain "especially personal items that people generally like to keep with them at all times" and added that if passenger Houghton were wearing the pocketbook, it "might then amount to a kind of 'outer clothing' which. . .would properly receive increased protection." *Houghton*, 526 U.S. at 307–08 (Breyer, J., concurring) (citing *Terry v. Ohio*, 392 U.S. 1, 24 (1968)).

criminal complaint—varying and sometimes indistinguishable degrees of proof apply. *Id.* at 319–20 (Abrahamson, C.J., concurring). In the warrantless search context, the proof necessary to establish probable cause is a "fair probability" that law enforcement authorities will find evidence in a particular place. *Hughes,* 2000 WI 24 at ¶ 21 (citing *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). Under *Gates,* 462 U.S. 213, courts invoke a totality of the circumstances test to determine whether fair probability exists.

¶ 75. We now apply the probable-cause-to-search-a-motor-vehicle exception to this case. Pallone argues that beer does not constitute "contraband" and therefore contends that the search of his duffel bag was improper. Pallone asks us to restrict the meaning of contraband to illegal or prohibited substances, or property that is unlawful to produce or possess. In Wisconsin, beer is not contraband per se, except under circumstances in which its mere possession would be unlawful.[18] *See, e.g.,* Wis. Stat. §§ 346.93 and 346.935 (1997–98). Nonetheless, beer receptacles and beer can be evidence of a crime. The case law does not exclusively address "contraband" per se as the legitimate target of a warrantless search. Rather, police may search passenger belongings capable of concealing evidence, "the object of the search." *Houghton,* 526 U.S. at 307.

¶ 76. Open containers of beer were the object of Officer Recknagel's search for evidence. Two Village of Fontana ordinances made it illegal to possess open containers of alcohol in public or in motor vehicles. The beer may not have been "contraband" per se, but the

_____

[18] An adult may not possess an open or unsealed bottle or receptacle containing alcoholic beverages in a privately owned motor vehicle. Wis. Stat. § 346.935(2) and (3).

possibility that open containers of beer were situated in the truck rendered beer the object of the search.[19] Were this court to limit the meaning of "contraband" to the parameters that Pallone crafts, evidence vital to many proceedings might be excluded.

¶ 77. We agree with the court of appeals that Recknagel had probable cause to carry out a full search of the truck and its contents for additional containers of open beer. *See Pallone*, 228 Wis. 2d at 280. When Riff stepped out of the truck holding an open bottle and then told Recknagel there were more open bottles in the truck, there was more than a fair probability that the vehicle contained additional evidence. Recknagel had probable cause to search the truck cab, and it was reasonable for him to search the "fairly large duffel bag, about twelve inches high, twelve inches wide, and maybe two, two-and-a-half feet long" that was situated on the bench in the cab. This spacious container had the capacity to hold additional open or closed bottles of beer, evidence that would support Riff's arrest and perhaps lead to an additional charge. Recknagel explained that he planned to search the duffel bag because it was located inside the vehicle. Recknagel thus apparently followed *Ross*, 456 U.S. at 825, which authorizes the search of every part of the vehicle and its content that may conceal the object of the search. When Pallone reached for the bag, he upgraded the cause for Recknagel's search. Recknagel testified that when he searched the duffel bag, he was looking both for weapons and evidence relating to the open intoxicants charge.

---

[19] Similarly, money can constitute "contraband" when it is used as evidence. *Jones v. State*, 226 Wis. 2d 565, 592, 594, 594 N.W.2d 738 (1999).

¶ 78. Under *Houghton*, the search was not rendered improper because the duffel bag belonged to Pallone. The inquiry turned not on whether Pallone or Riff owned the duffel bag, but whether open containers of beer—the specific thing for which Recknagel searched—might be in the duffel bag. *Houghton*, 526 U.S. at 302.

¶ 79. After Officer Recknagel inspected the duffel bag and came upon the baggie box, he candidly stated that he no longer was looking for beer or for a weapon. But there was probable cause to believe that the "Inositol Powder" bottle and the baggie box contained narcotics or controlled substances. We therefore agree with the circuit court that Recknagel had a basis for extending the search to its logical direction. If authorities discover evidence of a more serious crime during a lawful search, they need not halt their inspection. *Mabra,* 61 Wis. 2d at 623 (citing *Robinson*, 414 U.S. 218; *Gustafson*, 414 U.S. 260). As the court of appeals determined, it would defy common sense to require an officer to overlook incriminating evidence because the evidence did not relate to the initial purpose of the search. *Pallone*, 228 Wis. 2d at 281; *see also Ross*, 456 U.S. at 823–25.

¶ 80. Finally, we address Pallone's contention that the search violated his expectation of privacy. Under *Houghton*, passenger Pallone and driver Riff shared a diminished expectation of privacy. Searching the duffel bag was not a traumatically intrusive search and seizure of his person.

¶ 81. Article I, § 11 of the Wisconsin Constitution affords individuals no greater privacy expectations than those provided under the Fourth Amendment. Wisconsin, in this respect, is different from some other

states, like Washington. In *Parker*, 987 P.2d 73, the Washington Supreme Court afforded passengers enhanced privacy protections. The court premised its conclusion on long-standing state case law that grants individuals greater privacy protections than the Fourth Amendment. *Id.* at 78. Article I, section 7 of the Washington Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." *Id.*

¶ 82. The Wisconsin Constitution contains no similar "private affairs" clause. On the contrary, the language of art. I, § 11 is virtually identical to that of the Fourth Amendment. Consequently, this court "has refused to interpret Wisconsin's search and seizure provision differently than the Supreme Court," and has not afforded heightened privacy protections under the state constitution than under the Fourth Amendment. There is nothing in this case that tempts us to depart from this seasoned approach. We thus follow the interpretation set forth by the Supreme Court in *Houghton*, which entitles motor vehicle passengers to no greater privacy expectations than drivers. *Houghton*, 526 U.S. at 303–04.

¶ 83. We therefore hold that the warrantless search of Pallone's duffel bag was valid under the exception that allows warrantless searches when authorities have probable cause to believe that a vehicle contains the object of the search.

## CONCLUSION

¶ 84. We conclude that the search of the duffel bag was proper under both the search incident to arrest exception and the probable-cause-to-search-a-motor-vehicle exception to the constitutional warrant require-

ments. The search fulfilled the requirements of the search incident to arrest exception because it was incident to a valid arrest, the situation posed a heightened threat of danger, and there was a need to discover and preserve evidence. The warrantless search also was permissible because the officer had probable cause to believe that the vehicle contained the object of the search, and the duffel bag was a container capable of containing the object of the search.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 85. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting)*. In a refrain that has become all too familiar, the majority opinion dutifully repeats the principle that a "warrantless search is per se unreasonable unless one of the 'few specifically established and well-delineated exceptions' justifies the search,"[1] and then proceeds to find yet another exception. I agree with U.S. Supreme Court Justice Antonin Scalia that the warrant requirement "has become so riddled with exceptions that it [has become] basically unrecognizable."[2] Because the majority opinion recognizes another exception to the warrant requirement, I dissent.

¶ 86. This began as a civil case, a traffic violation. The initial encounter with the police involved the driver's violation of a municipal ordinance prohibiting

---

[1] Majority op. at ¶ 29 (quoting *State v. Phillips*, 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998)).

Despite espousing this principle clearly at ¶ 29, the majority confusingly suggests differently at ¶ 59.

[2] *California v. Acevedo*, 500 U.S. 565, 581 (1991) (Scalia, J., concurring).

drinking or possessing an open container of an alcoholic beverage in a motor vehicle.[3] Here the beverage was beer. The driver was arrested for violating the ordinance, a civil offense.[4] No misdemeanor or felony was alleged or suspected at the time of the driver's arrest.

## I

¶ 87. The majority holds that the search by law enforcement of the passenger's (the defendant's) duffel bag was justified because it was a search incidental to the driver's arrest. The majority concludes that a "heightened threat to officer safety or a need to discover or preserve evidence justif[ied] the warrantless search" in this case. Majority op. at ¶ 42.

¶ 88. Although the passenger's duffel bag might have contained a weapon dangerous to the officer, which might have justified a search, no weapon was found. No alcoholic beverages were found during the search either. Nevertheless, the search of the duffel bag continued, proceeding beyond looking for a weapon

---

[3] The Wisconsin statutes also prohibit such conduct and provide for a civil forfeiture of not more than $100. Wisconsin Stat. §§ 346.935 and 346.95(2m) (1997–98).

[4] No one challenged the validity of the arrest, and I do not address this issue. *See Atwater v. Lago Vista*, 195 F.3d 242 (5th Cir. 1999), *cert. granted*, — S. Ct. — (Mem), 68 USLW 3566, 2000 WL 248718 (U.S., June 26, 2000) (certiorari granted to review whether Fourth Amendment allows custodial arrest for a "misdemeanor traffic offense" under Texas law punishable only by a fine). *Cf. State v. Welsh*, 108 Wis. 2d 319, 342–45, 321 N.W.2d 245 (1982) (Shirley S. Abrahamson, J., dissenting, expressing doubts about constitutionality of Wis. Stat. § 345.22 (1977), authorizing warrantless arrest for a civil traffic offense committed outside the presence of an officer).

or evidence of an open container of an alcoholic beverage. The officer saw a box of plastic bags and when the officer looked inside the box he saw plastic bags containing white powder. Because the officer exceeded the lawful grounds of the search, the evidence should not be admissible under the "search incident to arrest" rule of the *Belton*[5] case as set forth by the majority opinion.

¶ 89. The majority opinion's lengthy discussion and attempted justification of its decision is puzzling given the majority's conclusion that "*Belton*[6] and *Fry*[7] allow the search of 'any containers' situated in the compartment [of the car]." Majority op. at ¶ 55. The majority opinion's discussion and justification suggest that the *Belton/Fry* rule permitting the search of any container in a vehicle is troubling. Indeed it is.

¶ 90. The U. S. Supreme Court's holding in *Belton* has been widely criticized. Professor Wayne R. LaFave, whose endorsement of bright-line rules to guide police officers in resolving Fourth Amendment issues the *Belton* majority quoted with approval,[8] concludes that *Belton* mistakenly allows automobile searches not based on probable cause, and thus creates the risk that "police will make custodial arrests which they otherwise would not make as a cover for a search which the Fourth Amendment otherwise prohibits."[9] A

---

[5] *New York v. Belton*, 453 U.S. 454 (1981).

[6] *New York v. Belton*, 453 U.S. 454, 460 (1981).

[7] *State v. Fry*, 131 Wis. 2d 153, 176–77, 388 N.W.2d 565 (1986).

[8] *New York v. Belton*, 453 U.S. 454, 458 (1981).

[9] Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 7.1(c) at 457 (3d ed. 1996).

A recent newspaper article quoted a Wisconsin state trooper as explaining his high number of drug seizures by saying that "[t]he secret is going beyond the traffic stop." Another

similar point was made by Justice William A. Bablitch in his dissent to *Fry*, 131 Wis. 2d 153, 187, 388 N.W.2d 565 (1986), which I joined, and by U.S. Supreme Court Justice John Paul Stevens in his dissent in *Robbins v. California*, 453 U.S. 420, 452 (1981).

¶ 91. The U.S. Supreme Court, in both civil liberties and other areas of law, is espousing a new federalism, with diminishing national powers and increasing state influence and importance.[10] In keep-

---

trooper was quoted as saying that, in the search for drugs, the state police are "looking for any and all [traffic] violations. A bad headlight might turn into an arrest of a drunk driver, a drug dealer or a drug user." A third trooper was quoted as saying "I stopped them for not having a working trunk latch." *Drug Busts Start as Traffic Stops*, Wisconsin State Journal, June 26, 2000, at 3B.

Other academic commentators have also criticized the *Belton* rule. For a lengthy discussion of the rule and its critics, *see State v. Pierce*, 642 A.2d 947, 955–58 (N.J. 1994); *Commonwealth v. White*, 669 A.2d 896, 907–08 (Pa. 1995) (Montemuro, J., concurring).

[10] For cases in which the U.S. Supreme Court reminded state courts that they are free to interpret their own constitutions as granting more protections to individuals than does the U.S. Constitution, *see, e.g, California v. Greenwood*, 486 U.S. 35, 43 (1988) (Fourth Amendment); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293 (1982) (First Amendment and vagueness); *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81 (1980) (First Amendment and property rights).

For recent cases invalidating federal statutes as beyond Congress's powers, *see, e.g., United States v. Morrison*, 120 S.Ct. 1740 (2000) (Violence Against Women Act); *United States v. Lopez*, 514 U.S. 549 (1995) (Gun-Free School Zones Act). *See also* Sandra Day O'Connor, *Our Judicial Federalism*, 35 Case W. Res. L. Rev. 1, 5–6 (1984–85); Sandra Day O'Connor, *Trends in the Relationship Between the Federal and State Courts from the Perspective of a State Court Judge*, 22 Wm. & Mary L. Rev.

ing with this new federalism, a significant number of
state courts have refused to adopt *Belton*, holding that
such a rule is inconsistent with their respective state
constitutional guarantees.[11] This court should follow
these states and refuse to adhere to *Belton* as a correct
interpretation of the Wisconsin Constitution.[12]

---

801, 803–804 (1981); William J. Brennan, *State Constitutions
and the Protection of Individual Rights*, 90 Harv. L. Rev. 489,
491 (1977).

[11] *See, e.g., State v. Brown*, 588 N.E.2d 113, 114–16 (Ohio
1992) (declining to follow *Belton* if *Belton* means that an arrest
for a traffic offense automatically authorizes detailed search of
arrestee's vehicle); *State v. Pierce*, 642 A.2d 947, 956, 959–60
(N.J. 1994) (declining to apply Belton to warrantless arrests for
motor-vehicle offenses; discussing other state cases); *Common-
wealth v. White*, 669 A.2d 896, 902 (Pa. 1995) (rejecting *Belton*
rule and adhering to earlier decision limiting the warrantless
search of a vehicle incident to an arrest to clothing and areas
immediately accessible to the arrestee; see also concurrence at
906–08, discussing other cases).

[12] I note that the defendant has a strong argument, not
addressed by the majority opinion, that because the police did
not initiate contact with the driver of the car until he was
outside of the car, the *Chimel* "immediate control" test should
apply rather than the *Belton/Fry* bright-line rule. *Chimel v.
California*, 395 U.S. 752 (1969). Under *Chimel* the search would
not be reasonable because the search occurred after the driver
had already been placed in the squad car. Therefore the arres-
tee did not have access to the interior of the car. Many courts
have held that the *Chimel* "immediate control" test applies
when the police do not initiate contact with the person arrested
until he or she is already outside of the vehicle. *See, e.g., United
States v. Strahan*, 984 F.2d 155, 159 (6th Cir. 1993) (because
defendant was approximately thirty feet from his vehicle when
arrested, *Belton* inapplicable and the *Chimel* test governs; the
passenger compartment of the vehicle was not within defen-
dant's "immediate control" at the time of the arrest and thus

¶ 92. This court has a long history of recognizing the vitality of the Declaration of Rights of the Wisconsin Constitution (article I) and of interpreting article I, § 11.[13] We should continue our traditional approach of examining our own constitution and our own precedents.[14] In drafting the Wisconsin Constitution the framers relied on the bills of rights of other state constitutions, not on the federal bill of rights, to protect Wisconsin citizens against governmental invasion of individual rights. Justice Abram Smith's statement in

"suppression is proper"); *State v. Foster*, 905 P.2d 1032, 1037–39 (Idaho 1995) (holding that *Belton* rule only applies when the defendant is arrested or the police at least make initial contact with the defendant in the vehicle; collecting a number of cases which apply this rule); *Lewis v. United States*, 632 A.2d 383 (D.C. App. 1983) (the *Belton* rule allowing search of vehicle upon arrest of occupant is confined to cases where the police confront, or at least signal confrontation, while the person is an occupant of a vehicle). *See also* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 7.1(a) at 436–37 and n.26 (3d ed. 1996) (citing cases).

[13] *See* Jack Stark, *The Wisconsin Constitution* at 58 (1997) (discussing this court's interpretation of article I, § 3); Joseph A. Ranney, *Trusting Nothing to Providence* at 513–515 (1999) (Wisconsin was among the most innovative of states interpreting constitutional rights of criminal defendants).

[14] *See, e.g., Jokosh v. State*, 181 Wis. 160, 163, 193 N.W. 976 (1923); *Hoyer v. State*, 180 Wis. 407, 417, 193 N.W. 89 (1923). *See also* John Sundquist, *Construction of the Wisconsin Constitution—Recurrence to Fundamental Principles*, 62 Marq. L. Rev. 531 (1979); Comment, *The Independent Application of State Constitutional Provisions to Questions of Criminal Procedure*, 62 Marq. L. Rev. 596 (1979); Comment, *Rediscovering the Wisconsin Constitution: Presentation of Constitutional Questions in State Courts*, 1983 Wis. L. Rev. 483; Joseph A. Ranney, *Trusting Nothing to Providence* at 499–500 (1999).

1855 urging the Wisconsin supreme court to look to the Wisconsin Constitution should be heeded by this court today:

> The people then made this constitution, and adopted it as their primary law. The people of other states made for themselves respectively, constitutions which are construed by their own appropriate functionaries. Let them construe theirs—let us construe, and stand by ours. *Attorney General ex rel. Bashford v. Barstow*, 4 Wis. 567 [*785](1855).

¶ 93. It is unfortunate that instead the majority follows the erratic course that the U.S. Supreme Court has set in the field of searches and seizures.

## II

¶ 94. The majority opinion also holds that the search of the passenger's duffel bag was constitutionally permissible because the police had probable cause to believe that they would find the object of their search. Majority op. at ¶¶ 75–77. This holding is not necessary to the opinion, and I disagree with this dictum.

¶ 95. While the police may have had probable cause to believe that open containers of an alcoholic beverage would be found *in the vehicle itself*, the search of the passenger's duffel bag was unreasonable as a matter of constitutional law and common sense. According to the majority, the proper inquiry is whether "there is reasonable cause to believe that the specific things to be searched for and seized are located" within the container being searched. Majority op. at ¶ 70, quoting *Wyoming v. Houghton*, 526 U.S. 295, 302 (1999). Similarly, Professor LaFave emphasizes that "for a warrantless search of a container

inside a vehicle to be lawful, the probable cause to search the vehicle must be as to objects which. . .could be concealed in the container opened."[15]

¶ 96. The circumstances of the present case do not meet the test the majority opinion and Professor LaFave put forth. The officer had already found the remnants of a twelve-pack of beer in the vehicle, containing both open and closed bottles. Majority op. at ¶ 11. It is simply not reasonable to expect to find open bottles of beer *inside* a duffel bag. The majority opinion concedes at ¶ 51 that it is "unlikely" that the defendant "would store spillable open bottles of beer in a duffel bag as the vehicle is in motion." The majority opinion's candor in this admission is diminished by its subsequent assertion that it was "conceivable" that the defendant put open bottles of beer in the duffel bag once the car was parked. Why would the defendant put open bottles of beer in a duffel bag while leaving a twelve-pack containing open and closed bottles of beer out in plain view in the vehicle? The mind boggles at the idea.

¶ 97. Try as the majority opinion will, its reasoning that the officer was looking for further evidence of the civil offense is not persuasive. The civil offense was completed when the officers found the open containers of alcoholic beverages. There is no showing that multiple containers constitute multiple offenses or increase

---

[15] Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 7.2(d) at 506 (3d ed. 1996) (discussing *United States v. Ross*, 456 U.S. 798 (1982), and *United States v. Acevedo*, 500 U.S. 565 (1991)). *See also* LaFave, 1999 Supp. § 7.2 at 63 (noting that U.S. Supreme Court's recent decision in *Wyoming v. Houghton*, 526 U.S. 295, 302 (1999), does not change this analysis, as *Houghton* only allows searches of those passengers' belongings "capable of containing the object of the search").

the penalty. I conclude that the officer lacked probable cause to search the duffel bag and that the search cannot be justified as a search for further evidence of the original offense.

### III

¶ 98. Today's opinion, together with the decisions in *State v. Fry*[16] and *State v. King*,[17] means that any violation of a civil state or municipal traffic law, no matter how minor, can result in a driver's arrest and the search of every piece of luggage and any container in a car, no matter to whom it belongs and no matter whether there is any reason to believe such a container holds a weapon or evidence.

¶ 99. I doubt that any member of this court would find it reasonable for a police officer to arrest him or her for a civil traffic offense and then search the entire passenger compartment and all the briefcases and luggage therein. The law relating to the scope of warrantless automobile searches has reached a shockingly low standard and is inconsistent with the principle espoused recently by this court in *State . v. Griffith*, 2000 WI 72 at ¶ 70, 236 Wis. 2d 48, 613 N.W.2d 72, that "an individual traveling in an automobile does not lose all legitimate expectations of privacy."

¶ 100. For the reasons stated, I dissent.

---

[16] *Fry*, 131 Wis. 2d 153, 388 N.W.2d 565 (1986).

[17] *State v. King*, 142 Wis. 2d 207, 418 N.W.2d 11 (Ct. App. 1987).

.

¶ 101. I am authorized to state that Justices WILLIAM A. BABLITCH and ANN WALSH BRADLEY join this dissent.